There is no dispute that the Insurer Colorado Health owed HHS money for the 2015 year under the Affordable Care Act's Risk Adjustment Program, and I'd like to make two basic points. The first is that a state has no more authority to prevent HHS from collecting a risk adjustment charge from an insurer that became insolvent and went out of business than a state would have from an insurer that is still in business, still functioning. And the second is that a state has no more authority to interfere with HHS's collection of a risk adjustment charge via netting than it would have simply to tell an insurer not to pay an invoice. I'm going to go back to the first point because I believe a misunderstanding on that point may have been the reason for the trial court's error below. Under the McCarran-Ferguson statute, Congress saved state laws enacted for the purpose of regulating the business of insurance, and it saved them from preemption by general acts of Congress. In the Stabe case on which the plaintiff had legalized, the only question was, was the state law enacted for the purpose of regulating the business of insurance? And it was a hard question that had generated a circuit split because the insurer had gone out of business and was in liquidation. And the Supreme Court nonetheless said, still, regulating the liquidation, the distribution of assets can be regarded as the regulation of the business of insurance for purposes of McCarran-Ferguson. But that was still peripheral. The core is the regulation of the ongoing business of insurance. And the reason that none of this matters here is because the Affordable Care Act specifically relates to the business of insurance. And McCarran-Ferguson Act's reverse preemption provision by its terms is not implicated when, as here, you have a statute like the Affordable Care Act that specifically relates to the business of insurance. So, the only question was the particular mechanism by which HHS collected Colorado Health's risk adjustment payment for the 2015 benefit year. And what it did was applying a netting promulgated under the Affordable Care Act. Instead of collecting a sum of money from Colorado Health under the risk adjustment program and making a separate payment under the Affordable Care Act's reinsurance program, HHS netted out the two, which meant that Colorado Health wasn't entitled to any payments. And then that enabled HHS... Counsel, this is Susan Moore. If Colorado actually had a no netting statute, no netting statute across the board, not just contract cases, not just insurance cases, but a no netting statute, would HHS have been permitted to adopt a netting regulation? And would that netting regulation... Well, they would have been permitted to adopt it, but would that netting regulation then have trumped or preempted the that HHS would administer various Affordable Care Act programs, including on behalf of states, and specifically delegated authority to HHS to take such actions as necessary to implement those provisions? And as this court has recognized in various cases, such as Contreras and Doe that we cited in our brief, that's a broad grant of authority for HHS to fill gaps as consistent with the statutory policies. And a valid ACA regulation preempts contrary state law, as illustrated by the Second Circuit's decision recently in UnitedHealthcare, and the older Eighth Circuit's decision in the St. Louis case. The more recent... This is Judge Chen. The question I have about the nature of this netting regulation and its origins is that it appears from the Federal Register Notice to emanate from the desire for convenience and efficiency. And it's more like a payment mechanism convenience, much more than that, than some implementation of some core criteria, core substantive criteria of the Affordable Care Act, whether it's actually coming up with some methodology related to risk adjustment or reinsurance, which was much more what that Second Circuit case, as well as the Eighth Circuit case, seemed to me about. I didn't see anything in the Federal Register Notice that discussed the need for a netting regulation beyond mere administrative convenience. Am I missing something in how the netting regulation was justified by HHS? Well, let me unpack what is meant by efficiency, which is, I think, the term that HHS used when it issued the netting regulation. If you just think about the risk adjustment program by itself, there are a huge number of payment transfers that HHS has to make every year, roughly $5 billion worth of payment transfers every year. And that's just risk adjustment. And as the Tenth Circuit explained in the New Mexico Health Connections case, these transfers happen very quickly, year after year, to stabilize the insurers that are entitled to the funds, to help them continue to operate. So in this context, the efficiency of distributing the risk adjustment, or it could be reinsurance funds, is part and parcel of the purpose of the program, which is to stabilize insurers that are entitled to those payments. But as I understand the Federal Register Notice, I understand there's maybe billions of transactions going on. And so the idea behind the netting regulation is, okay, instead of 2 billion transactions, we'll just do 1 billion transactions because we'll have this netting. Still have a billion transactions. Well, it is absolutely still quite burdensome for HHS. And so it's not surprising that every state is relying on HHS to administer its risk adjustment and reinsurance programs. But that doesn't make it any less important that HHS be able to use every tool at its disposal to expeditiously collect and distribute these billions and billions of dollars that insurers count on for their own settlement. But I also want to go back to the basic question, which is netting is one tool HHS uses to collect the risk adjustment or other charges that insurers owe to the Affordable Care Act. But if HHS had simply sent an invoice to an insurer, a state has no authority to tell the insurer, don't pay, pay less, pay later. Well, counsel doesn't... Wait, counsel, counsel, counsel. If the insurer is in an insolvency proceeding, doesn't the state have to follow state insolvency law, which in this case, prioritizes the creditors that are coming after money? So while the state doesn't say, don't pay the government, the state does say, first, pay out all the claimants, i.e. the insurer... Well, actually, first, pay the administrative overhead charges. Second, pay out the claimants, the insurers, then pay the government. Isn't that totally, fairly within the purview of state insolvency law? Not when, as here, it's preempted by the Affordable Care Act, by a statute that specifically regulates the business of insurance. That's why, when I was talking about the Karen Ferguson Act, there's no doubt that states generally regulate liquidation, establish priority, etc. And there's, it's established that if you just had a general, federal statute... So wait, so you're telling me your position, the government's position now, is so much further than I understood it to be, because you're telling me the government's position is if a debt is owed under the ACA, then it trumps insolvency law entirely, not just the government's allowed to do netting, but even if there's nothing to net against, if a debt is owed, the government becomes the first creditor entitled to top priority, simply because this is an ACA transaction, and it trumps state insolvency law, which otherwise makes the government the third collector in line. That's correct. Now, here, of course, the court only needs to address netting, because there were debts to net. However, if you look at the plain terms of the McCarran-Ferguson Act, all that matters is that the Affordable Care Act and its provisions specifically relate to the business of insurance. So the reason that the Supreme Court's decision in FABE is totally off the table here is because we have the Affordable Care Act establishing the insurer's substantive risk adjustment payment obligation. Okay. Thank you, Ms. Klein. Let's hear from opposing counsel. May I please the court? Cliff Elgarten for Michael Conway, the Colorado Insurance Commissioner and the liquidator of the Colorado Health Insurance Cooperative. In our view, Judge Hirtling had this decision below. And frankly, the government's arguments, I had not fully appreciated them until I started reading their letters, seem to be directed at something entirely different than what was held or what was explained in this case. The government thinks its debts are not subject to state insolvency law. And that's simply wrong. It is fully subject to insolvency law and bankruptcy law. The controlling decision in this case is really the 1979 decision of the Supreme Court in Kimball Foods, because it provides the controlling framework for deciding all collections of federal debts, federal lien law. The bottom line here on the collection of federal debt, in any case involving insolvency or priority, whether it is insurance or otherwise, and that's why McCarran is fairly irrelevant here. The bottom line is that the collection of federal debt, unless there is a federal statute that provides a priority or creates a limitation, the federal debt is subject to the same priority rules, the same limitations as apply to any other creditor. Those priority rules can be from federal bankruptcy law when federal bankruptcy law applies or state insolvency or priority law for the cases that are outside of federal bankruptcy. In fact, for the 100 years when there was no federal bankruptcy law, it was always state insolvency and priority law that applied, except when the federal priority statute or federal lien statutes applied. The Supreme Court's decisions in Kimball Foods talk about the primacy of state law here. And they clearly indicate that when the federal priority statute doesn't apply, the federal debt is subject to state law. And we cited to you in our letter of November 11th, we cited it to the government, the Cook County versus National Bank case from the 1880s, the United States versus Oklahoma case from the 1920s, and the New York Guaranteed Trust case from 1930, all point to the fact that applicable insolvency law comes into play immediately for the collection of federal debts. And those cases lead up to the Kimball Foods case in 79, and they've been 1993. So if there is an applicable federal statute addressing insolvency or priority, then the federal priority statute prevails, of course. But if there is no priority statute, the mere fact the government is the plaintiff doesn't win the case for them. And what wins the case for them is they have to submit to the state insolvency law. So I'd like to focus a moment a little more on preemption, which seems to be the nature of their argument. But I do want to cover just for a moment at the end, if I'm reminded that I have two minutes, the Proust case and the government's arguments that they threw in under the claims court's jurisdictional statutes. Those weren't raised by the government below in any form. And I would like to tie up that loose end at the end. So I'm going to try to do that. But let me go back to preemption. The government's arguments missed the most basic aspects of the legal framework here. The priority statute that ordinarily gives federal debts a priority that allows them to take setoffs doesn't apply here. We know that that was the only significance of McCarran-Ferguson because it knocks out the priority statute. Beyond that, nobody relies on McCarran until we get way down into the standards for preemption. Nothing in the ACA or the netting rule, however, purports to expand the government's creditor rights in an insolvency or bankruptcy. Federal law does not touch that issue once we've knocked out the priority statute. Therefore, there is no conflict with state laws on this point. Therefore, there's no preemption. That's true as a matter of basic legal principles and as a matter of unbroken precedent. And the precedents are the ones I cited earlier. Legal principle first. The United States, like any party owed money, has statutory and common law rights to recoveries, and it has innumerable self-help and legal remedies, just as I would as a private party. Let's say a contract says, or the ACA says, Mr. Elgarten, you owe someone or you owe the government $100. The government could attach my assets, it can garnish my wages, it can seize my accounts, it could execute on liens. But for centuries, all those rights and remedies, all such substantive rights and remedies draw the line at insolvency. Why? Because insolvency and priority law deal with a different subject matter. They deal with the situation where there's more than one creditor that has a meritorious claim on some money, and the debtor does not have enough money to go around. That's why we have insolvency law. That's why we have priority law. That's why we have bankruptcy law. So the government could adjudicate its claims to its heart's content, it could ordinarily take setoff, but it all stops at the point of insolvency, because insolvency law answers the question of who wins, who gets priority, how money is to be divided when there is not enough money to go around to satisfy every legal obligation. And that is the only issue here. Who gets this money? The policyholders who bought the health insurance, who get a priority on the Colorado insurance liquidation law, or the federal government for all of its claims. The government is now telling us that the government always wins in an insolvency case, I guess in a bankruptcy case. But Fabe says the policyholders appropriately come first, because the priority statute that would allow the government to win all the time doesn't apply. So the government is spending a lot of time jousting with arguments that weren't part of Judge Hertling's decision and are not part of our decision. We know what kind of statute it would take to create a priority or to allow a setoff. The federal super priority statute has been in effect for over 200 years. That is such a law. It's part of the Debt Collection Act. And that's where the government gets its priority and its right to take setoffs to its heart's delight. But it doesn't apply here. When it filed a proof of claim, I think that's where it was going by claiming that it had a priority. Jeff Bryson, let me ask you something just to make sure I understand your position. Suppose the netting regulation had been in the statute itself in the ACA. Do you think this would be a different case? No, because the netting statute, I would interpret as going to what the ordinary rights of a creditor are outside of bankruptcy. It doesn't really have to be in the statute. Yes, go on. My next question is suppose that netting statute, this assumed netting statute, specifically said with respect to liquidation or otherwise? Absolutely would apply. That is the point here. It doesn't say that. It looks just like the common law right of netting, which every party could net to its heart's delight outside of bankruptcy. But it can't once there is an insolvency. And I would point the court to the historic Cook County bank case, which we cited in our November 11 letter. That's 107 U.S. 445, where they say exactly that. They say the United States, you could have set off all you want. But once there's a bankruptcy, you're subject to all the special limitations on set off that apply in bankruptcy. Matter of fact, the right of set off, I think we all understand is a basic, the right of limiting set off is a right that comes into play only when you are in the insolvency setting because it is a protection of priorities. As a matter of fact, some of the cases, including the Supreme Court cases, specifically say set off is a form of priority. That's what they say. I'd point to Gold Star Liquors as a case which says it in exactly that same way. By the way, the government did point to a case where there was a statute. They had it in their applied brief where there was a federal statute that did seek, even in the absence of the priority rule, excuse me, the super priority statute to create the kind of priority that exists here. The Rhode Island Guarantee Fund was a case where the federal statute specifically, just as you asked Judge Bryson, dealt with the priority of federal liens. And it said, well, the federal statute applies. It deals with priorities. Of course, it's going to preempt the state law. But none of that has to do with what takes place in an insolvency when the government does not have a statute that deals with priority, does not have a statute that creates it. And to respond to a question Judge Chen asked, my colleague, the netting regulation is purely of the same form as all administrative set off regulations are, and the same as the common law right of set off. It is a convenience mechanism that always applies, except when you get to insolvency. And when you reach insolvency, at the time the government learns of the insolvency, it becomes subject to those rules. Those ordinary creditor prerogatives, including the ordinary right of set off or netting, halt when insolvency begins. And that is the holding, literally the holding at 453 of the Cook County bank case. So that's what the controlling circumstance here is. And, you know, really, when you get right down to it, the controlling issue, as I said, was the one that Judge Hertling reaches at the end. The lien statutes that were being construed in Kimball Foods really face the same question. There are two parties with conflicting claims on a piece of property. There's a state lien and a federal lien. Kimball Foods actually says, all of these issues of collection of federal money are federal issues. However, they say you look to the state rule of decision to decide those issues. And the United States is always subject to the applicable insolvency law. If it was in bankruptcy law, there are a couple of limitations on how they could assert their right of set off. One is the mutuality rule. There's another one about timing. In an insurance insolvency, that has been accepted from the federal bankruptcy law and has been left to the states, just like lien law in Kimball Foods. And there you look to the applicable state law to decide what the outcome is. I said I wanted to turn, just comment on the citation of the claims court's jurisdictional statutes. And they cite 31 U.S.C. 3728. What those statutes say and mean is the government has a right to assert a set off. And there is certainly jurisdiction to consider the counter claims or the set off in the claims court. That's why we are here. That is the general rule in all courts. If the trustee in an ordinary bankruptcy goes into a court that has jurisdiction and asserts a claim, the debtor may raise a set off any claim he has against the bankrupt. And the court ordinarily issues only one judgment for the difference. Many cases say that the Baker versus Gold Seal liquors is one. That's a Supreme Court case from 74. But the ability to assert the argument of the set off doesn't mean you win. What determines whether you win is a substantive right. And that substantive right includes the applicable insolvency law, whether it is federal bankruptcy law when that applies or state priority law when that applies. Why the government and this is why I wanted to raise the issue. The government pointed to an offhand observation in Pruess and that's what I wanted to comment on. The government is all excited about Pruess because Pruess said in passing when it was holding that jurisdiction lies to assert a counterclaim. It said in passing that if the government had pursued its counterclaim in bankruptcy court, it might only be paid a small portion of the distribution. In other words, there could be a different result depending on whether you're in the claims court or in the bankruptcy court. But that offhand observation, it was really only a comment, not even a dictum about what might happen in federal bankruptcy court. That was simply not briefed and was simply wrong. The same substantive law applies in whatever form we're litigating. That's actually what the holding of Kimball Foods is. Whatever jurisdiction you're in, you can know Pruess is wrong because you know that if in that case when the government asserted its counterclaim, it really wasn't a set off because there was no affirmative claim that was still there. If the government got a judgment for its money, it would still have to go back to the bankruptcy court to collect and then it would be subject to the priority law or the priority rules that apply in the bankruptcy court. Well, that happened to be federal bankruptcy court. That was at issue in Pruess. Here it is different. We are excluded from federal bankruptcy court and therefore the insolvency law that applies is the law that comes into place when you have to go, excuse me, when a matter is excluded. Does that mean I have two minutes? No, that's the end of your time, counsel. Okay, well then I'm concluded. Thank you very much, Your Honor. Okay, Ms. Klein, you have some rebuttal time. Thank you. Picking up on Judge Bryson's question, the premise of the other side's argument is that the Affordable Care Act's substantive risk adjustment provision that's codified at 42 U.S.C. 18063 implicitly excludes insurers that go out of business that are in liquidation. It's wrong. That premise is wrong under the plain terms of 18063. If you look at subpart C, where Congress defined the scope, who's covered by the risk adjustment program, it's any health plan that provides coverage in the individual or small group market within the state. The only statutory exception being for grandfathered plans, which are plans that are not subject to the ACA's community rating and guaranteed issue reforms and other market reforms. And this makes perfect sense because if you had an implicit exception for a defunct insurer, the consequence would be that the defunct insurer would be stifening off risk adjustment funds that are designed to stabilize the surviving insurers. And as I said in the opening, the whole point of the risk adjustment and other stabilization programs is to stabilize the market of the insurers that are actually in business. So almost nothing that was just said bears on our argument here because the substantive risk adjustment charge is dictated by the substantive provisions of the ACA. I could go on and talk about the separate federal common point, but that's an independent basis for preemption here that is derived from longstanding Supreme Court recognition that the government has the same setoff rights of other creditors. It has to follow the procedures for setoffs, but that the right does not vary from state to state. It's not dependent upon the idiosyncrasies of a particular state law. And so as Judge in your opening, your opposing counsel didn't have an opportunity to address it. I'm not going to let you go any further in rebuttal. So I understood your argument today. Yeah, understood, Your Honor. Thank you. I thank both counsel. The case is taken under submission. Could I ask just very quickly a question just for clarification? Ms. Klein, when you were making the argument out about the ACA provision on preemption, that depends, I take it, on your assertion that the netting regulation is treated as if it has the same status as a statutory provision, right? Not exactly, because recall I said even if HHS sent an invoice to the insurer, there's no exception because the insurer is insolvent. So here it happened to rely on netting, but our argument doesn't depend on that. So you think that even if we were to conclude that the statute in the ACA that refers to the statute itself, even if we were to conclude that that did not include the netting regulation, you would still prevail? So you don't need that statute in effect? Correct, Your Honor. All right. So well, okay. Okay. I thank both counsel. The case is taken under submission.